## HART COAL CORPORATION et al. v. SPARKS, U. S. Atty., et al.

District Court, W. D. Kentucky.
May 19, 1934.

Norman, Quirk & Graham and Van Winkle & Skaggs, all of Louisville, Ky., for plaintiffs.

T. J. Sparks, U. S. Atty., of Louisville, Ky., and Dwight L. Savage, Sp. Asst. to Atty. Gen., for defendants.

DAWSON, District Judge.

The plaintiffs seek in this action to enjoin Thomas J. Sparks, United States attorney for the Western district of Kentucky, and J. R. Layman, state compliance director of Kentucky, appointed under the National Industrial Recovery Act (48 Stat. 195), from initiating or prosecuting any suit or suits in equity or any criminal proceedings against them for violations of a certain order issued by General Hugh S. Johnson, Administrator for National Recovery, on March 31, 1934, as supplemented by an order issued by said Johnson on April 22, 1934; these orders having been issued as amendments to and supplements of the Code of Fair Competition for the Bituminous Coal Industry, approved and recommended by said Johnson, Administrator, etc., and promulgated by the President on September 18, 1933. On application for a temporary restraining order, the action was dismissed as to the defendant, J. R. Layman, state compliance director, it affirmatively appearing that he has no authority to direct, institute, or control any proceeding, civil or criminal, against violators of the code. A temporary restraining order was granted, enjoining the defendant, Sparks, as United States attorney, pending further order of the court, from initiating any prosecution or other action to enforce the penalties attempted to be authorized by the National Recovery Act for violations of codes promulgated under its terms. The matter is now before me on motion for a preliminary injunction against the United States attorney.

The thirty-four plaintiffs are engaged in bituminous coal mining in the Western Kentucky coal field, and they produce approximately 90 per cent. of all the coal produced in that field.

The bill alleges that, notwithstanding the fact that the mining and production of coal for market is not interstate commerce, and that Congress has no power to regulate same, many of the plaintiffs joined in submitting to the President for his approval a Code of Fair Competition for the Bituminous Coal Mining Industry in Western Kentucky; that the Western Kentucky mining field has for

many years been a sharply defined subdivision of the coal industry, having peculiar and exceptional problems not existing in other competitive coal mining areas; that, by reason of the relative thinness of the coal seams and the resulting high per ton cost of production, and because of high freight rate differentials against the field, this field must be regarded as a separate and distinct unit in the coal producing industry; that, in the code submitted by this field, these exceptionally adverse conditions were given recognition in the wage scale which it proposed; but that this code was rejected and a so-called National Code for the Bituminous Coal Industry, providing for much higher minimum wages, was formulated by the said Johnson, Administrator, and approved by the President.

It is further alleged that, notwithstanding many of the provisions of the so-called National Code, and particularly the minimum wage scales therein prescribed, were wholly unacceptable to the plaintiffs and other producers in Western Kentucky, they yielded obedience to and proceeded to operate under it, relying upon certain clauses of the code providing for a readjustment of minimum wages and hours of service, after investigation of these matters in the manner provided for in the code; that, as a result of the investigation conducted by the code authorities as to the matter of wages, hours, and freight differentials, it was disclosed that for the month of November, 1933, the Western Kentucky coal field, operating under the wages fixed in the National Code, had sustained a loss of 6.95 cents per ton on coal produced, while their competitors in the Southern Illinois field for the same period had made a profit of 10.52 cents per ton, and in the Indiana field of 7.76 cents per ton; that thereupon the representatives of the Western Kentucky operators requested of the Administrator a readjustment of the wage scale in Western Kentucky, but that no action was taken upon this request until March 31, 1934, when General Johnson, Administrator, without notice or hearing, arbitrarily and in disregard of the facts, issued one of the orders complained of herein, by which the minimum wage scale for the Western Kentucky field and certain other fields, including Alabama, as fixed in the original code, was greatly increased and the hours of service reduced from eight hours to seven hours per day, with no corresponding increases in the fields of Illinois and Indiana, except such increases as resulted from changing the hours of service from eight to seven hours per day; that

thereupon the plaintiffs, knowing that they could not operate under the increased wage scale except at a heavy loss, reduced the operations of their mines to the minimum necessary to fill existing contracts, and proceeded to Washington for a hearing on the order, which was had on April 9, 1934; that at this hearing, in support of their claim that they could not live under the wages prescribed, they offered figures compiled and findings made by the National Recovery Administration itself, and that no evidence to the contrary was offered or heard by the National Recovery Administration; that at this hearing the representative of General Johnson, Administrator, conducting the hearing, was asked if there was any other evidence in possession of the Administrator bearing upon the ability of the Western Kentucky field to operate without a loss under the prescribed wages, and that they were advised that there was no such other evidence; that, notwithstanding these facts, the said Johnson, as Administrator, on April 22, 1934, issued the second order complained of, declining to reduce the wage scale for the Western Kentucky field, as fixed in his order of March 31, 1934, but materially reducing it for the Alabama field, which is a competitor of the Western Kentucky field in Southern markets; that this reduction of the Alabama wage scale, without a corresponding reduction in the Western Kentucky field, inevitably operates to close to the plaintiffs those markets in the South in which Alabama coal is a competitor; and that the combined effect of the two orders of March 31st and April 22d is to practically exclude them from all competitive markets, North and South, and to destroy their business.

The orders complained of are attacked as an unconstitutional attempt on the part of the national government to regulate matters exclusively reserved to the states and to the people under the Tenth Amendment to the Federal Constitution; and as violative of the Fifth Amendment to the Constitution, in that it deprives the plaintiffs of their property without due process of law. It is further claimed that, conceding the power of Congress to regulate hours of service and wages in coal mines, the National Recovery Act is unconstitutional because of an unlawful delegation of legislative power; that, conceding the validity of the act, the orders complained of are arbitrary and capricious and made in disregard of the provisions of the Code of Fair Competition for the Bituminous Coal Industry and of the facts developed under the terms of that code.

The answer of the defendant, in addition to denying many of the allegations of the bill, portrays coal mining as a great national industry and the importance of the product of such mines to many of the basic industries of the country located in states other than those in which the coal is produced, and to the railroads carrying a large part of the interstate commerce of the country, and claims for Congress the power to regulate and foster the industry as one affecting interstate commerce, and the affidavit of Wayne P. Ellis was offered in support of this theory.

At the threshold of the case I am met with the suggestion that the plaintiffs are in no position to seek equitable relief, first, because they have an adequate remedy at law; and, second, because, by operating under the terms of the code promulgated under the National Recovery Act and accepting its benefits, they are precluded from attacking the constitutionality of the act and of the orders complained of, purporting to have been issued under its authority.

In view of the heavy penalties provided in the act for violating codes of fair competition promulgated under it, there can be no doubt, under well-settled equity principles, of the inadequacy of the remedy at law.

I think the suggestion that the plaintiffs are estopped by their alleged previous acceptance of and operation under the code to question the constitutionality of the orders complained of, and of the act as construed by those charged with its enforcement, is pressing the doctrines of estoppel and waiver to an unreasonable limit; and, in fairness to the district attorney and his counsel, it should be stated that this contention has not been very vigorously urged. The court must be presumed to know what is common knowledge. The authorities charged with the enforcement of the National Recovery Act have proclaimed from the date of its passage that the codes promulgated under it are the law of the land and binding upon every person in the industry affected, whether they consent to same or not, and that upon a violation of such codes the dire penalties fixed in the act would be imposed upon them. No opportunity of election was presented. Not only this, but they were threatened with boycotts and blacklisting if they dared to operate in disregard of the terms of the code applicable to their particular industry. It seems to me that, in view of this well-known and publicly proclaimed attitude of the authorities, the government is in a poor position to contend that its citizens operating under the codes are precluded from questioning the constitutional authority of those who seek to enforce them.

Furthermore, it is pleaded and not denied that these plaintiffs had nothing to do with fixing the terms of the code here involved; that they merely acquiesced in and operated under it after it was promulgated, as the national authorities were insisting they were legally compelled to do. To treat their past acquiescence and compliance with its terms under these conditions as voluntary and as an election to operate under it would be not unlike treating the unresisting march of the condemned criminal to the gallows as his consent to his own execution.

The right claimed for the President and his subordinates under the act to regulate hours of service and wages in coal mines either is, or is not, authorized under the Constitution, and those charged with the enforcement of the act, and claiming authority under it, should not desire, nor will they be permitted, under the specious plea of estoppel or waiver, to evade a judicial determination of this important question.

Section 1 of the act (15 USCA § 701) reads: "A national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist. It is hereby declared to be the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of cooperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources."

Section 3 (a), 15 USCA § 703 (a) authorizes the President, upon application to him by one or more trade or industrial associations or groups, to approve voluntary codes of fair competition for such trades or

industries as are represented by the applicants, provided certain conditions and requirements of the statute are met.

Section 3 (b), 15 USCA § 703 (b) provides: "After the President shall have approved any such code, the provisions of such code shall be the standards of fair competition for such trade or industry or subdivision thereof. Any violation of such standards in any transaction in or affecting interstate or foreign commerce shall be deemed an unfair method of competition in commerce within the meaning of the Federal Trade Commission Act, as amended [chapter 2 of this title]; but nothing in this title shall be construed to impair the powers of the Federal Trade Commission under such Act, as amended [chapter 2]."

Section 3 (d), 15 USCA § 703 (d) provides: "Upon his own motion, or if complaint is made to the President that abuses inimical to the public interest and contrary to the policy herein declared are prevalent in any trade or industry or subdivision thereof, and if no code of fair competition therefor has theretofore been approved by the President, the President, after such public notice and hearing as he shall specify, may prescribe and approve a code of fair competition for such trade or industry or subdivision thereof, which shall have the same effect as a code of fair competition approved by the President under subsection (a) of this section."

Section 3 (f), 15 USCA § 703 (f) provides that, when a voluntary code of fair competition has been approved by the President, as authorized by section 3 (a), or when such a Code has been prescribed by the President under section 3 (d) "any violation of any provision thereof in any transaction in or affecting interstate or foreign commerce shall be a misdemeanor and upon conviction thereof an offender shall be fined not more than $500 for each offense, and each day such violation continues shall be deemed a separate offense."

Section 4 (15 USCA § 704) reads:

"(a) The President is authorized to enter into agreements with, and to approve voluntary agreements between and among, persons engaged in a trade or industry, labor organizations, and trade or industrial organizations, associations, or groups, relating to any trade or industry, if in his judgment such agreements will aid in effectuating the policy of this title with respect to transactions in or affecting interstate or foreign commerce, and will be consistent with the requirements of clause (2) of subsection (a) of section 3 [section 703] for a code of fair competition.

"(b) Whenever the President shall find that destructive wage or price cutting or other activities contrary to the policy of this title are being practiced in any trade or industry or any subdivision thereof, and, after such public notice and hearing as he shall specify, shall find it essential to license business enterprises in order to make effective a code of fair competition or an agreement under this title or otherwise to effectuate the policy of this title, and shall publicly so announce, no person shall, after a date fixed in such announcement, engage in or carry on any business, in or affecting interstate or foreign commerce, specified in such announcement, unless he shall have first obtained a license issued pursuant to such regulations as the President shall prescribe. The President may suspend or revoke any such license, after due notice and opportunity for hearing, for violations of the terms or conditions thereof. Any order of the President suspending or revoking any such license shall be final if in accordance with law. Any person who, without such a license or in violation of any condition thereof, carries on any such business for which a license is so required, shall, upon conviction thereof, be fined not more than $500, or imprisoned not more than six months, or both, and each day such violation continues shall be deemed a separate offense. Notwithstanding the provisions of section 2 (c) [section 702 (c)], this subsection shall cease to be in effect at the expiration of one year after the date of enactment of this Act [June 16, 1933] or sooner if the President shall by proclamation or the Congress shall by joint resolution declare that the emergency recognized by section 1 [section 701] has ended."

The foregoing provisions of the act make it perfectly apparent that Congress relied upon the commerce clause of the Constitution to justify the legislation. The declaration of policy contained in section 1 clearly proclaims this, and the penalties provided in the act for violations of its terms and for violation of the codes promulgated under it are carefully restricted to transactions in or affecting interstate or foreign commerce, and section 7 (d), 15 USCA § 707 (d) defines interstate and foreign commerce as follows: "The terms 'interstate and foreign commerce' and 'interstate or foreign commerce' include, except where otherwise indicated, trade or commerce among the several States and with foreign nations, or between the District of

Columbia or any Territory of the United States and any State, Territory, or foreign nation, or between any insular possessions or other places under the jurisdiction of the United States, or between any such possession or place and any State or Territory of the United States or the District of Columbia or any foreign nation, or within the District of Columbia or any Territory or any insular possession or other place under the jurisdiction of the United States."

■ Under well-settled rules of statutory construction, the language of this act should be construed by the courts according to the commonly accepted and understood meaning of the words used. In the light of this rule, and indulging the presumption that Congress was familiar with the well-understood limits of its powers under the commerce clause, as determined by the Supreme Court, it is difficult to escape the conclusion that the act was drawn with full appreciation of the limitations upon the powers of Congress under the commerce clause, and with no intention of exceeding these powers; or was deliberately dressed in constitutional language to conceal a purpose to exercise a degree of regulation not within the fair intendment of the language used; or else those charged with the enforcement of the act have construed it to authorize the regulation of matters not intended by Congress to be regulated.

The second alternative I unhesitatingly reject. The question of whether those charged with the enforcement of the Recovery Act are misconstruing it in their attempt to regulate the production and preparation of coal for market is not material. The real question is: Does the act, as so construed, transcend the constitutional power of Congress?

■ In considering this question, we must never forget that the national government is one of delegated powers, and that Congress possesses only such legislative powers as are expressly or by implication conferred upon it by the people in the Constitution. Even though the Ninth and Tenth Amendments to the Constitution had never been adopted, it would be difficult, in the light of the history of the Constitution, of its source, and of the objects sought to be accomplished by it, to reach any other conclusion than that there is reserved to the states or to the people all the powers and rights not expressly or impliedly conferred upon the national government. But the Ninth Amendment, which declares, "The enumeration in the Constitution, of certain rights, shall not be construed to deny or to disparage others retained by the people," and the Tenth Amendment, providing that "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people," put this matter beyond all question. Therefore Congress does not have all legislative power. It possesses only such legislative power as has been expressly or impliedly conferred upon it.

■ By clause 3, § 8, art. 1 of the Constitution, Congress is given the power "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

It is to be noted that the power vested in Congress by this clause is not the power to regulate every activity of the people. It does not grant the power even to regulate all commerce; it must be interstate or foreign commerce, embracing within that power, of course, the power to regulate such acts and transactions as, within constitutional limitations, can be reasonably deemed to directly affect interstate commerce. Interstate commerce cannot constitutionally be stretched to reach those activities not embraced within the meaning of the word "commerce." "Commerce" has been defined by Webster as intercourse, especially the exchange or the buying and selling of commodities; trade or traffic; and of course includes the movements necessary to such intercourse, trade or traffic, and the instrumentalities of such movements, but it does not include production or manufacture of articles of commerce.

In the case of McCall v. California, 136 U. S. 106, 10 S. Ct. 881, 882, 34 L. Ed. 392, the following definition of commerce, given by Pomeroy in his work on Constitutional Law is approved: "It includes the fact of intercourse and of traffic, and the subject-matter of intercourse and traffic. The fact of intercourse and traffic, again, embraces all the means, instruments, and places by and in which intercourse and traffic are carried on, and, further still, comprehends the act of carrying them on at these places, and by and with these means. The subject-matter of intercourse or traffic may be either things, goods, chattels, merchandise, or persons."

Since Gibbons v. Ogden, 9 Wheat. at page 1, 6 L. Ed. 23, the Supreme Court has been called upon innumerable times, not only to define what is interstate commerce, within the regulatory power of Congress, but also what is not interstate commerce, and these opinions graphically portray the scope which has been given to the commerce clause, in order

that national authority may be fully and completely exercised over this matter of national concern, yet without invading the rights reserved to the states and the people under the Tenth Amendment. They have been but the logical development, under the particular facts involved, of the definition of interstate commerce given in Hopkins v. United States, 171 U. S. 578, 19 S. Ct. 40, 47, 43 L. Ed. 290: "Definitions as to what constitutes interstate commerce are not easily given so that they shall clearly define the full meaning of the term. We know from the cases decided in this court that it is a term of very large significance. It comprehends, as it is said, intercourse for the purposes of trade in any and all its forms, including transportation, purchase, sale, and exchange of commodities between the citizens of different states, and the power to regulate it embraces all the instruments by which such commerce may be conducted."

Cases illustrating the scope of the power are W. W. Montague & Co. v. Lowry, 193 U. S. 38, 24 S. Ct. 307, 48 L. Ed. 608; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 20 S. Ct. 96, 44 L. Ed. 136; Swift & Co. v. United States, 196 U. S. 375, 25 S. Ct. 276, 49 L. Ed. 518; Lemke v. Farmers' Grain Co., 258 U. S. 50, 42 S. Ct. 244, 66 L. Ed. 458; Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; Chicago Board of Trade v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839; Dahnke-Walker Milling Co. v. Bondurant, 257 U. S. 282, 42 S. Ct. 106, 66 L. Ed. 239; Coronado Coal Co. v. United Mine Workers of America, 268 U. S. 295, 45 S. Ct. 551, 69 L. Ed. 963; United States v. Ferger, 250 U. S. 199, 39 S. Ct. 445, 63 L. Ed. 936; United States v. Patten, 226 U. S. 525, 33 S. Ct. 141, 57 L. Ed. 333, 44 L. R. A. (N. S.) 325; Railroad Commission of Wisconsin v. C., B. & Q. R. R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; Houston, East & West Texas Railway Co. v. United States, 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341. But in no case has the Supreme Court ever decided, or even hinted, that the power to regulate interstate commerce, or transactions affecting interstate commerce, embraces the power to regulate the production and manufacture of articles intended for commerce. On the contrary, that court has been at pains to point out that these activities are exclusively within the control of the states, or reserved to the people.

In the case of United States v. E. C. Knight Co., 156 U. S. at page 1, 15 S. Ct. 249, 253, 39 L. Ed. 325, the court said:

"Doubtless the power to control the manufacture of a given thing involves, in a certain sense, the control of its disposition, but this is a secondary, and not the primary, sense; and, although the exercise of that power may result in bringing the operation of commerce into play, it does not control it, and affects it only incidentally and indirectly. Commerce succeeds to manufacture, and is not a part of it. * * *

"It is vital that the independence of the commercial power and of the police power, and the delimitation between them, however sometimes perplexing, should always be recognized and observed, for, while the one furnishes the strongest bond of union, the other is essential to the preservation of the autonomy of the states as required by our dual form of government; and acknowledged evils, however grave and urgent they may appear to be, had better be borne, than the risk be run, in the effort to suppress them, of more serious consequences by resort to expedients of even doubtful constitutionality. * * *

"The regulation of commerce applies to the subjects of commerce, and not to matters of internal police. Contracts to buy, sell, or exchange goods to be transported among the several states, the transportation and its instrumentalities, and articles bought, sold, or exchanged for the purposes of such transit among the states, or put in the way of transit, may be regulated; but this is because they form part of interstate trade or commerce. The fact that an article is manufactured for export to another state does not of itself make it an article of interstate commerce, and the intent of the manufacturer does not determine the time when the article or product passes from the control of the state and belongs to commerce."

In the case of Kidd v. Pearson, 128 U. S. at page 1, 9 S. Ct. 6, 10, 32 L. Ed. 346, which was dealing with the constitutionality, under the commerce clause, of a state law which prohibited the manufacture therein of liquor even for shipment out of the state, the court said:

"No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactures and commerce. Manufacture is transformation—the fashioning of raw materials into a change of form for use. The functions of commerce are different.

The buying and selling and the transportation incidental thereto constitute commerce; and the regulation of commerce in the constitutional sense embraces the regulation at least of such transportation. The legal definition of the term, as given by this court in County of Mobile v. Kimball, 102 U. S. 691, 702 [26 L. Ed. 238], is as follows: 'Commerce with foreign countries, and among the states, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities.' If it be held that the term includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that congress would be invested, to the exclusion of the states, with the power to regulate, not only manufactures but also agriculture, horticulture, stock-raising, domestic fisheries, mining,—in short, every branch of human industry. For is there one of them that does not contemplate, more or less clearly, an interstate or foreign market? Does not the wheat-grower of the northwest, and the cotton-planter of the south, plant, cultivate, and harvest his crop with an eye on the prices at Liverpool, New York, and Chicago? The power being vested in congress and denied to the states, it would follow as an inevitable result that the duty would devolve on congress to regulate all of these delicate, multiform, and vital interests,—interests which in their nature are, and must be, local in all the details of their successful management.

"It is not necessary to enlarge on, but only to suggest, the impracticability of such a scheme, when we regard the multitudinous affairs involved, and the almost infinite variety of their minute details. * * *

"The demands of such a supervision would require, not uniform legislation generally applicable throughout the United States, but a swarm of statutes only locally applicable, and utterly inconsistent. Any movement towards the establishment of rules of production in this vast country, with its many different climates and opportunities, could only be at the sacrifice of the peculiar advantages of a large part of the localities in it, if not of every one of them. On the other hand, any movement towards the local, detailed, and incongruous legislation required by such an interpretation would be about the widest possible departure from the declared object of the clause in question."

In the case of Delaware, Lackawanna & Western R. R. Co. v. Yurkonis, 238 U. S. 439, 35 S. Ct. 902, 59 L. Ed. 1397, there was involved the question of whether Yurkonis, who was injured while working in a coal mine belonging to the railroad company, the coal from which was to be used by the railroad company in the operation of its interstate trains, was engaged in interstate commerce at the time he was injured so as to bring him under the provisions of the Federal Employers' Liability Act (45 USCA §§ 51–59). The court held that the mining of coal was not commerce, and the fact that it was being mined for use in the operation of trains in interstate movements did not bring such mining under the control of the national government under the commerce clause of the Constitution.

In Heisler v. Thomas Colliery Co., 260 U. S. 245, 43 S. Ct. 83, 86, 67 L. Ed. 237, there was involved the constitutionality under the commerce clause of a Pennsylvania statute taxing anthracite coal when prepared and ready for shipment or market. The act was attacked on the ground that the tax was a burden on interstate commerce, the argument being that Pennsylvania had a virtual monopoly in anthracite coal, that the major part of the production finds its market in other states, and that the necessary and intended result of the law was to pass this tax on to the citizens of other states and thus burden interstate commerce. The case was most carefully considered, the Attorneys General of nine different states in which Pennsylvania anthracite coal finds a market appearing in the Supreme Court to urge its unconstitutionality because it burdened interstate commerce. In response to this contention, the court said:

"The reach and consequences of the contention repels its acceptance. If the possibility, or indeed certainty, of exportation of a product or article from a state determines it to be in interstate commerce before the commencement of its movement from the state, it would seem to follow that it is in such commerce from the instant of its growth or production, and in the case of coals, as they lie in the ground. The result would be curious. It would nationalize all industries, it would nationalize and withdraw from state jurisdiction and deliver to federal commercial control the fruits of California and the South, the wheat of the West and its meats, the cotton of the South, the shoes of Massa-

chusetts and the woolen industries of other states at the very inception of their production or growth, that is, the fruits unpicked, the cotton and wheat ungathered, hides and flesh of cattle yet 'on the hoof,' wool yet unshorn, and coal yet unmined because they are in varying percentages destined for and surely to be exported to states other than those of their production.

"However, we need not proceed further in speculation and argument. Ingenuity and imagination have been exercised heretofore upon a like contention. There is temptation to it in the relation of the states to the federal government, being yet superior to the states in instances or rather having spheres of action exclusive of them."

Oliver Iron Co. v. Lord, 262 U. S. 172, 43 S. Ct. 526, 529, 67 L. Ed. 929, involved the constitutionality under the commerce clause of a Minnesota statute imposing a tax on the business of mining iron ore equal to 6 per cent. of the value of the ore produced. It was claimed that, inasmuch as substantially all the ore produced was mined with the expectation that it would be, and actually was, immediately loaded on cars and shipped into other states to satisfy existing contracts, the mining of the ore constituted interstate commerce, and the imposition of a tax on such mining was a burden upon such commerce. In response to this contention, the court said: "Plainly the facts do not support the contention. Mining is not interstate commerce, but like manufacturing, is a local business, subject to local regulation and taxation. * * * Its character in this regard is intrinsic, is not affected by the intended use or disposal of the product, is not controlled by contractual engagements, and persists even though the business be conducted in close connection with interstate commerce."

Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 531, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, involved the constitutionality under the commerce clause of the Act of Congress of September 1, 1916 (39 Stat. 675), prohibiting transportation in interstate commerce of goods made in any factory employing certain kinds of child labor. The court held that the regulation of the business of manufacturing was beyond the reach of Congress under the commerce clause, and, in discussing the proposition, said: "Commerce 'consists of intercourse and traffic * * * and includes the transportation of persons and property, as well as the purchase, sale and exchange of commodities.' The making of goods and the mining of coal are not commerce, nor does the fact that these things are to be afterwards shipped, or used in interstate commerce, make their production a part thereof. * * * Over interstate transportation, or its incidents, the regulatory power of Congress is ample, but the production of articles, intended for interstate commerce, is a matter of local regulation. * * * If it were otherwise, all manufacture intended for interstate shipment would be brought under federal control to the practical exclusion of the authority of the states, a result certainly not contemplated by the framers of the Constitution when they vested in Congress the authority to regulate commerce among the states. * * * It is further contended that the authority of Congress may be exerted to control interstate commerce in the shipment of child-made goods because of the effect of the circulation of such goods in other states where the evil of this class of labor has been recognized by local legislation, and the right to thus employ child labor has been more rigorously restrained than in the state of production. In other words, that the unfair competition, thus engendered, may be controlled by closing the channels of interstate commerce to manufacturers in those states where the local laws do not meet what Congress deems to be the more just standard of other states. There is no power vested in Congress to require the states to exercise their police power so as to prevent possible unfair competition. Many causes may co-operate to give one state, by reason of local laws or conditions, an economic advantage over others. The commerce clause was not intended to give to Congress a general authority to equalize such conditions. In some of the states laws have been passed fixing minimum wages for women, in others the local law regulates the hours of labor of women in various employments. Business done in such states may be at an economic disadvantage when compared with states which have no such regulations; surely, this fact does not give Congress the power to deny transportation in interstate commerce to those who carry on business where the hours of labor and the rate of compensation for women have not been fixed by a standard in use in other states and approved by Congress. The grant of power to Congress over the subject of interstate commerce was to enable it to regulate such commerce, and not to give it authority to control the states in their exercise of the police power over local trade and manufacture. The grant of authority over a purely federal matter was not intended to destroy the local pow-

er always existing and carefully reserved to the states in the Tenth Amendment to the Constitution."

It was held in Crescent Cotton Oil Co. v. Mississippi, 257 U. S. 129, 42 S. Ct. 42, 66 L. Ed. 166, that the separation of the seed from the fiber of cotton, through the use of a cotton gin, was a part of the manufacture of both the seed and fiber into useful articles of commerce, and the fact that these articles while in process of manufacture were intended for export to another state did not make such ginning interstate commerce.

In Utah Power & Light Co. v. Pfost, 286 U. S. 165, 52 S. Ct. 548, 552, 76 L. Ed. 1038, it was held that the generation of electricity from water power, and the transmission of the current over wires from the generator to consumers in another state, are two entirely separate and distinct operations, one a local manufacturing operation, subject to exclusive state control, and the other interstate commerce. The court said:

"We are satisfied, upon a consideration of the whole case, that the process of generation is as essentially local as though electrical energy were a physical thing; and to that situation we must apply, as controlling, the general rule that commerce does not begin until manufacture is finished, and hence the commerce clause of the Constitution does not prevent the state from exercising exclusive control over the manufacture. Cornell v. Coyne, 192 U. S. 418, 428, 429, 24 S. Ct. 383, 48 L. Ed. 504. 'Commerce succeeds to manufacture, and is not a part of it.' United States v. E. C. Knight Co., 156 U. S. 1, 12, 15 S. Ct. 249, 253, 39 L. Ed. 325.

"Without regard to the apparent continuity of the movement, appellant, in effect, is engaged in two activities; not in one only. So far as it produces electrical energy in Idaho, its business is purely intrastate, subject to state taxation and control. In transmitting the product across the state line into Utah, appellant is engaged in interstate commerce, and state legislation in respect thereof is subject to the paramount authority of the commerce clause of the Federal Constitution."

In United Mine Workers of America v. Coronado Coal Co., 259 U. S. 344, 42 S. Ct. 570, 582, 66 L. Ed. 975, 27 A. L. R. 762, the Supreme Court again declared, "Coal mining is not interstate commerce, and the power of Congress does not extend to its regulation as such," and the force of this decision is not at all weakened by the subsequent decision of the Supreme Court in Coronado Coal Co. v. United Mine Workers of America, 268 U. S. 295, 45 S. Ct. 551, 69 L. Ed. 963, for there the court simply held that on the second trial of the case in the lower court the evidence showed that there was a conspiracy to directly interfere with and obstruct interstate commerce.

In the very recent case of Chassaniol v. City of Greenwood, 54 S. Ct. 541, 78 L. Ed. 1004, decided March 12, 1934, Mr. Justice Brandeis, writing for the court, again emphasized the fact that manufacturing processes and acts directly in connection therewith do not constitute interstate commerce, even though the product manufactured is intended for sale and shipment in interstate commerce.

Cases emphasizing the lack of power in the national government, under the commerce clause, to regulate manufacture and production, could be multiplied; but to refer to them would unnecessarily extend this opinion. Indeed, it seems to me that the lack of such power is as axiomatic as is the proposition that no state is entitled to more than two Senators under the Constitution. He who would find in such cases as Stafford v. Wallace and Chicago Board of Trade v. Olsen, supra, authority for the exercise of such power, has read the opinions of the Supreme Court on the subject to but little purpose, and fails to comprehend that those cases dealt with acts, instrumentalities, and agencies directly connected with or affecting interstate commerce, and in no wise involve the regulation of manufacture or production.

As the defendant seeks to justify the orders here involved solely under the commerce clause of the Constitution, and as the act plainly indicates that Congress found its justification under that clause, I should probably be justified in testing the constitutionality of these orders under that clause alone; but the matter is of such grave importance, and courts are so reluctant to strike down as unconstitutional, acts of co-ordinate departments of the government, that I feel constrained to search further to determine if justification can be found for the orders involved in any other provision of the fundamental law. Frankly, I would be at a loss to conjecture under what other provision or provisions of the Constitution those who claim for the national government the right to regulate manufacture and production could, in good faith, profess to find such authority but for the arguments advanced from time to time by those who defend the exercise of this authority. Generally speaking, aside from

the commerce clause, the act, as construed by those charged with its enforcement, has been defended as a proper exercise of national power in a great emergency; or as an exercise of the inherent power of the national government to accomplish the purposes set forth in the Preamble of the Constitution, and some have thought that it could be justified by clause 1, § 8, art. 1, of the Constitution, which vests in Congress the power "To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

██ Certainly no emergency, no matter how pressing, can clothe Congress with any power to legislate on matters not expressly or impliedly confided to it by the Constitution.

In the great case of Ex parte Milligan, 4 Wall. 2, 120, 18 L. Ed. 281, the Supreme Court exploded the doctrine that emergency creates national power in the following language: "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence; as has been happily proved by the result of the great effort to throw off its just authority."

In Wilson v. New, 243 U. S. 332, 37 S. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024, the Supreme Court again held that a national emergency could not be made the source of congressional power; that it could not call into existence a power not granted in the Constitution. And again, in the very recent case of Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481, the Supreme Court, through Mr. Chief Justice Hughes, was careful to explain that, while emergency may afford a reason for the exertion of admitted legislative power, it cannot call into life a power which has never existed.

The so-called Rent Cases—Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165; Brown Holding Co. v. Feldman, 256 U. S. 170, 41 S. Ct. 465, 65 L. Ed.

877; Levy Leasing Co. v. Siegel, 258 U. S. 242, 42 S. Ct. 289, 66 L. Ed. 595; and the more recent cases of.Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481, and Nebbia v. State of New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, decided by the Supreme Court on March 5, 1934, have been thought by many to afford support for the emergency doctrine; but this conception of these cases is erroneous.

The case of Block v. Hirsh, supra, involved the extent to which the police power of Congress over the District of Columbia may be exercised in an emergency; and Brown Holding Co. v. Feldman and Levy Leasing Co. v. Siegel, supra, involved the extent of the valid exercise of the police power of the state of New York in an emergency. The same question was involved in the Minnesota case of Home Building & Loan Association v. Blaisdell and the New York case of Nebbia v. New York, supra.

██ In considering these cases, it is important to keep in mind that the national government has no police power, as that term is generally understood, within the boundaries of sovereign states, except over property therein owned by the government in its proprietary capacity. It does possess such police power over the District of Columbia by virtue of clause 17, § 8, art. 1, of the Constitution, which authorizes Congress "To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards and other needful Buildings."

This provision of the Constitution vests in Congress all legislative power over the District of Columbia, and such power, of course, includes the general police power inherent in governments possessing unrestricted legislative authority. So, in the District of Columbia Rent Case, the Supreme Court found that the underlying power necessary to sustain the legislation was the police power conferred by the Constitution over the District, and that the emergency simply justified the exercise of this admitted existing power to an extent which would not be tolerated in normal times.

The only police power possessed by Con-

gress other than that heretofore noted is over the territories and public domain of the United States, and the authority for the exercise of the police power in this field is found in clause 2, § 3, art. 4, of the Constitution, which provides: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."

The generally recognized power of Congress to define certain acts as crimes, and fix the punishment therefor, does not rest upon the police power proper, but upon the expressly or impliedly granted powers of the national government and upon that provision of the Constitution conferring upon Congress the power to make all laws necessary for carrying into execution the enumerated powers of the national government. Thus Congress under the commerce clause has the power to define offenses against such commerce and fix the punishment therefor, and the same is true with reference to the other powers expressly or impliedly conferred upon the national government. But this is a very different thing from the police power which embraces the right to legislate for the general welfare, health, and safety of the community. This is the highest power possessed by a government having unrestricted legislative authority. Granted a reasonable basis for its exercise, it acknowledges few, if any, limitations in such a government; but, with the exceptions heretofore noted, it is not possessed by the government of the United States, except to the extent that it exists in connection with the exercise of its delegated powers. See The Lottery Case, 188 U. S. 321, 23 S. Ct. 321, 47 L. Ed. 492; Hipolite Egg Co. v. United States, 220 U. S. 45, 31 S. Ct. 364, 55 L. Ed. 364; Caminetti v. United States, 242 U. S. 470, 37 S. Ct. 192, 61 L. Ed. 442, L. R. A. 1917F, 502, Ann. Cas. 1917B, 1168.

It would hardly seem necessary to demonstrate the fallacy of the claim that there is any inherent or general power unmentioned in the Constitution to accomplish the purposes set forth in the preamble to that instrument. It would seem perfectly apparent that the objects set forth in the preamble were intended by the fathers to be attained through the exercise of the powers granted to the national government in the Constitution; otherwise the national government is not one of limited delegated powers, but of unlimited powers, with Congress free to accomplish the purposes set out in the preamble in whatever way may appeal to the judgment of that body. Of course, the statement

of this proposition carries with it its own refutation.

The present, however, is not the first time that the argument has been advanced that the preamble contains an affirmative grant of power. Such a contention was advanced in Jacobson v. Massachusetts, 197 U. S. 11, 25 S. Ct. 358, 359, 49 L. Ed. 643, 3 Ann. Cas. 765, and Mr. Justice Harlan, for the court, disposed of this contention in this language: "We pass without extended discussion the suggestion that the particular section of the statute of Massachusetts now in question * * * is in derogation of rights secured by the preamble of the Constitution of the United States. Although that preamble indicates the general purposes for which the people ordained and established the Constitution, it has never been regarded as the source of any substantive power conferred on the government of the United States, or on any of its departments. Such powers embrace only those expressly granted in the body of the Constitution, and such as may be implied from those so granted. Although, therefore, one of the declared objects of the Constitution was to secure the blessings of liberty to all under the sovereign jurisdiction and authority of the United States, no power can be exerted to that end by the United States, unless, apart from the preamble, it be found in some express delegation of power, or in some power to be properly implied therefrom."

Clause 1, § 8, art. 1, of the Constitution, which vests Congress with the power to lay and collect taxes, etc., is so punctuated that, if considered by itself, it might be construed as conferring two separate and distinct powers upon Congress—one to lay and collect taxes, and the other to pay the debts and provide for the common defense and general welfare of the United States. Of course, if such construction were given to this section, it would wipe out all limitations upon the powers of Congress and leave it with unlimited power to legislate for the general welfare of the United States. The inevitable result compels a rejection of such a construction.

Story, in his Work on Constitutional Law, after a careful consideration of the clause, reached the conclusion that it should be construed as if it literally read to empower Congress to lay and collect taxes, duties, imposts, and excises, *in order* to pay the debts and provide for the common defense and general welfare of the United States, and this construction was approved in United

States v. Boyer (D. C.) 85 F. 425, and has never been questioned by any court of reputable authority.

So far as I am advised, the only contention that there is any other constitutional provision supporting the power here claimed is the suggestion, which has been rather tentatively advanced by the general counsel for the National Recovery Administration, that the authority is implicit in clause 5, § 8, of article 1, which empowers Congress to coin money and regulate the value thereof. It is suggested that the federal government would be acting within its delegated powers under this clause in relating the value of money to the wages of labor, and could thus bring within national control the wages and hours of service in every industry in the country. I am quite satisfied that no reputable court would so construe that provision of the Constitution, and the suggestion only serves to illustrate the straits to which those are driven who would sustain the National Recovery Act as construed by its enforcers.

The scheme of regulation of the strictly local affairs of the citizens of the country, attempted to be set up and enforced under the Recovery Act, has no place in our system of government, and it is futile for its defenders to attempt to justify it on constitutional grounds. No such justification can be found. It is the boldest kind of usurpation—dared by the authorities and tolerated by the public only because of the bewilderment of the people in the present emergency. Every person at all familiar with the Constitution and our scheme of government under it knows that no such power exists, and its mere academic assertion would be amusing, but its determined exercise is tragic. In the exercise of this claimed power, the national authorities have reached out and by codes and other regulations are attempting to regulate every conceivable character of local business —the tailor in his shop, the merchant in his store, the blacksmith at his forge, the coal operator, and the manufacturer. Apparently, none of the activities of man are acknowledged as beyond its reach. If the existence of such a power in the national government be admitted, it means the end of constitutional government in this country, under which individual effort and initiative have been fostered and encouraged, and the people generally have enjoyed a degree of liberty of person and security of property unknown to the rest of the world. I know of no higher duty of the national courts, the judges of which are sworn to support and defend the Constitution of the United States, than to strike down such an unwarranted invasion of the reserved powers of the states and the rights of the people.

In view of my conclusions on the fundamental question of the power of Congress to regulate the matters dealt with in the orders complained of, there is no occasion to consider the other objections urged against the validity of these orders, and I shall not do so except to observe that, conceding such power, the act would be an unconstitutional delegation of that power to the President, as it sets up no standards to guide him in carrying out the legislative policy and will expressed in the act. United States v. Grimaud, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563; Interstate Commerce Commission v. Goodrich Transit Co., 224 U. S. 194, 32 S. Ct. 436, 56 L. Ed. 729; Hampton & Co. v. United States, 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624.

A preliminary injunction, enjoining the defendant Sparks, as United States attorney, from initiating any prosecution or other action to enforce the penalties attempted to be authorized by the National Industrial Recovery Act for violations by the plaintiffs, or any of them, of the orders of General Hugh S. Johnson, National Administrator, dated March 31, 1934, and the amended and modified order of said Johnson, as National Administrator, dated April 22, 1934, both of same purporting to be amendments to and supplements of the Code of Fair Competition for the Bituminous Coal Industry, attempted to be promulgated under the provisions of the National Recovery Act, is granted.

I see no occasion at this time for making the preliminary injunction any broader in its scope than here indicated.