## UNITED STATES et al. v. NEUENDORF et al.

### No. 4552.

District Court, S. D. Iowa, Central Division. Oct. 19, 1934.

Edwin G. Moon, U. S. Atty., and Dwight L. Savage, Sp. Asst. to Atty. Gen., for petitioners.

H. M. Coggeshall and F. F. Faville, both of Des Moines, for respondents.

DEWEY, District Judge.

A bill of complaint has been filed in this court in the name of the United States of America and Henry A. Wallace, Secretary of Agriculture, by Edwin G. Moon, United States Attorney in and for the Southern District of Iowa, under the direction of the Attorney General, complaining that Louis Neuendorf and Marguerite Neuendorf, individually and doing business under the firm name of the Hillcrest Dairy, a copartnership, are distributing milk within the Des Moines, Iowa, sales area without a license, and asking that they be permanently enjoined from selling and distributing milk or cream in the Des Moines sales area, and for a preliminary or temporary injunction pendente lite.

· The cause came on for hearing on the application for the temporary injunction in open court at Des Moines, Iowa, on the 24th day of September, 1934, and on the pleadings and affidavits submitted by the parties.

From these affidavits and pleadings it was established that Marguerite Neuendorf is the wife of Louis Neuendorf and that in the name of the Hillcrest Dairy they are engaged in producing and distributing milk within the Des Moines sales area, and that all the milk they handle is produced solely in the state of Iowa and is sold by them to their local customers wholly within the state of Iowa.

On February 10, 1934, the Secretary of Agriculture issued "License No. 31—License for Milk—Des Moines, Iowa, Sales Area," which permitted processors, associations of producers, and others in the Des Moines area to engage in the handling in the current of interstate commerce of any agricultural commodity. This license was issued generally and no license specifically was issued for or in the name of the individual defendants or to the Hillcrest Dairy. Said license and amendments thereto provided for a minimum price to be paid by distributors of fluid milk to producers and provided for inspection of the books and records of all producers and distributors within the sales area and the making of reports to the Department of Agriculture. Claiming that these defendants had not complied with these and other provisions of the license, the Secretary of Agriculture instituted departmental proceedings for the cancellation of the license in so far as it applied to these defendants, and said license was in pursuance to said proceedings rescinded and canceled as against these defendants, but notwithstanding this procedure the defendants have continued to violate the provisions of the license and are doing so at this time.

It is alleged by the plaintiffs that the defendants during all of this period were and are continuously engaging in the purchasing of milk and cream from producers and selling said milk and cream in whole or in part to diverse persons in the Des Moines sales area,

and that they were and are "distributors," as defined in and by license No. 31.

The complaint of the plaintiffs then recites facts supported by an affidavit of E. W. Gaumnitz, Economic Adviser to the Dairy Section of the Agricultural Adjustment Administration, as bearing upon the direct allegation that the defendants are doing business in the current of interstate commerce, to the effect that the state of Iowa, together with the states of Minnesota, Nebraska, and Wisconsin, produce and process in excess of 40 per cent. of the total United States production of creamery butter, and that the states of New York and Wisconsin produce and process approximately 64 per cent. of the total United States production of cheese, and the states of Wisconsin and California produce and process in excess of 50 per cent. of the total United States production of evaporated milk; that almost 60 per cent. of the entire United States production of milk is manufactured into butter and other dairy products and the balance consumed in fluid form as whole milk or cream; that manufactured milk, that is, milk processed into butter and cheese, etc., is shipped in large quantities to Chicago and eastern cities in interstate commerce; that there is a close relationship between market milk and manufactured milk, that the price of one affects and controls the price of the other, and market milk is generally delivered by producers to distributors where it is so commingled that the milk of each producer is indistinguishable from that of others and it becomes impossible to ascertain what portion, if any, of the milk of a single producer is consumed locally or in the form of manufactured products and what portion thereof is transported in interstate commerce; that the city of Des Moines is an area of surplus market production and that cream, butter, and other manufactured products are transported in interstate commerce to the East and Middle West; that the free flow of manufactured dairy products between markets in all sections of the country tends to establish a national price for such products which varies as between localities only by a small differential in the cost of transportation; that the prevailing economic depression has resulted in a decrease of the buying powers of consumers, and as a result price wars and destructive competitive practices have reduced the price to the producers for fluid milk below the point justified by the supply and demand situation; also, the decrease in the price of butter and dairy products has reacted to decrease the price paid to producers of market milk, that it is necessary to stabilize and maintain the price paid to producers for milk sold in fluid form in order to stabilize and maintain the price paid to producers for milk manufactured into butter and other products, and this makes necessary a uniform program for the regulation of fluid milk markets throughout the country in order to stabilize prices, remove obstructions to the free flow of dairy products between states, and stabilize the price for such products which move in interstate commerce.

It is alleged that license No. 31 and similar milk licenses issued by the Secretary of Agriculture throughout the nation were and are reasonable and appropriate means for regulating interstate commerce and increasing the flow thereof (1) by increasing the return to farmers for milk handled in the current of interstate commerce, and (2) by increasing the purchasing power of dairy farmers to the end that they may in turn increase their purchases and so stimulate interstate commerce in agricultural products.

License No. 31 was issued by the Secretary of Agriculture under section 8 of the Agricultural Adjustment Act (chapter 26, title 7, U. S. C. [7 USCA § 608]), which provides:

"Sec. 8. In order to effectuate the declared policy, the Secretary of Agriculture shall have power— * * *

"(3) To issue licenses permitting processors, associations of producers, and others to engage in the handling, in the current of interstate or foreign commerce, of any agricultural commodity or product thereof, or any competing commodity or product thereof. * * * *"

Said license and amendments thereto provide, among other things, for a minimum price that distributors may pay for fluid milk within the Des Moines sales area.

From the foregoing it is apparent that the defendants are not engaged directly in buying, selling, producing, or shipping fluid milk or manufactured milk in interstate commerce; that is, in commerce from one state to another state within the Union. But it is the contention of the government, as I understood from the oral arguments, that in those territories where there is an excess of milk products, the excess products must be shipped to other states and commercial centers where the price is fixed by the many elements entering therein and this price is directly related to and controls the price paid to the producers of milk throughout the United States; and this condition is interminably intertwined

with that affecting manufactured products, which because of their close relationship to fluid milk control the price both of fluid milk and the manufactured products. From this the Secretary of Agriculture claims the right to fix the price to be paid to producers, to relieve the low prices resulting from the depression and the price-cutting wars which unstabilize and reduce to an unconscionable amount the price for milk and its products in the industrial centers and thus affects and lays a burden on interstate commerce.

There is no question as to the existence of the depression and its resulting demoralizing influence upon the price received by producers for milk, as well as for all agricultural products, nor the advisability of some regulations by the Congress; but the question whether or not the Congress has the power and authority to control in this manner the fixing of a price which a distributor must pay to a producer where he is engaged solely in intrastate business presents a serious question for determination.

The defendants set up a great number of defenses which primarily may be classified as follows: (1) That the Agricultural Adjustment Act is unconstitutional in delegating legislative authority to the Secretary of Agriculture, (2) that the license and its provisions are arbitrary and unreasonable and hence invalid as not being due process of law, (3) that milk license No. 31, by its own terms, belies its interstate character and is beyond the power delegated to the federal government, and (4) that the business of the Hillcrest Dairy is not in the current of interstate commerce and is therefore not subject to federal control.

We consider the latter defense as determinative of the questions presented.

Under the state of facts presented it is unnecessary to pass upon the questions of the power of Congress to control business engaged in interstate commerce under the Agricultural Adjustment Act (7 USCA § 601 et seq.), nor the constitutionality of its delegation of authority to the Secretary of Agriculture. For, granting this power and authority, it is apparent that under the facts here the Secretary may not license or regulate the business of the defendants where it is conducted entirely within the state of Iowa.

The power granted is to license "others" to engage in the handling of any agricultural commodity in the *current of interstate commerce.*

Not only is the power limited to handling commodities in interstate commerce, but "in the current" thereof.

The government of the United States is one of limited powers. The Tenth Amendment to the Constitution expressly so declares: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

And Amendment 9 provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

Among the powers delegated to the United States by article 1 of the Constitution, in section 8 thereof, is the power "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

It is under this power that the Congress delegated authority to the Secretary of Agriculture by the Agricultural Adjustment Act under consideration.

The Supreme Court of the United States has on numerous occasions held that manufacturing, making of goods, the mining of coal, and like industries are not commerce, nor does the fact that these things are to be afterwards shipped or used in interstate commerce make their production a part thereof. United States v. E. C. Knight Co., 156 U. S. 1, 15 S. Ct. 249, 39 L. Ed. 325; Anderson v. United States, 171 U. S. 604, 19 S. Ct. 50, 43 L. Ed. 300; Hopkins v. United States, 171 U. S. 578, 19 S. Ct. 40, 43 L. Ed. 290; Delaware, Lack. & West. R. R. v. Yurkonis, 238 U. S. 439, 35 S. Ct. 902, 59 L. Ed. 1397; Rast v. Van Deman & Lewis Co., 240 U. S. 342, 360, 36 S. Ct. 370, 60 L. Ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455; Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; United Mine Workers v. Coronado Coal Co., 259 U. S. 344, 407, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762; Coronado Coal Co. v. United Mine Workers, 268 U. S. 295, 45 S. Ct. 551, 69 L. Ed. 963; Nashville, C. & St. L. Ry. v. Wallace, 288 U. S. 249, 53 S. Ct. 345, 77 L. Ed. 730, 87 A. L. R. 1191; Industrial Ass'n v. United States, 268 U. S. 64, 79, 45 S. Ct. 403, 69 L. Ed. 849; Chassaniol v. Greenwood, 291 U. S. 584, 54 S. Ct. 541, 78 L. Ed. 1004.

The business of the defendants presents a typical one where the business engaged in is entirely intrastate.

In Kidd v. Pearson, 128 U. S. 1, 21, 9 S. Ct. 6, 10, 32 L. Ed. 346, the Supreme Court said: "If it be held that the term (interstate commerce) includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that congress would be invested, to the exclusion of the states, with the power to regulate, not only manufacture, but also agriculture, horticulture, stock-raising, domestic fisheries, mining,—in short, every branch of human industry. * * *"

The government does not claim, however, that the production of milk and its sale within a state are interstate commerce, but that the price paid to producers by the defendants as distributors has a substantial and direct effect upon interstate commerce.

In its last analysis perhaps all dealings in basic commodities and industries affect or may affect interstate commerce. To extend the authority of Congress to include a regulation of all business that may or even does indirectly affect interstate commerce would include the power to regulate all business engaged in any commercial transactions, and, if so permitted, would so enlarge the commerce clause of the Constitution as to emasculate the intent of the Tenth Amendment to retain in and for the states all powers not delegated to the national government.

The Supreme Court of the United States has had these questions before it on numerous occasions and, while the decisions are harmonious, the fact questions cover a wide field of discussion.

A line of demarcation is whether the evil sought to be remedied by restraint or regulation, directly, naturally, and substantially burdens interstate commerce. If it does, the Congress may remedy it. If the effect upon interstate commerce is only indirect, remote, ancillary, accidental, secondary, or merely probable, it has no power to interfere, but any regulations thereof must be by the Legislatures of the several states. Swift & Co. v. United States, 196 U. S. 375, 397, 25 S. Ct. 276, 49 L. Ed. 518; Minnesota Rate Cases, 230 U. S. 352, 410, 429, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1511, Ann. Cas. 1916A, 18; Lemke v. Farmers' Grain Co., 258 U. S. 50, 59, 42 S. Ct. 244, 66 L. Ed. 458; Stafford v. Wallace, 258 U. S. 495, 521, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; United Mine Workers v. Coronado Coal Co., and Coronado Coal Co. v. United Mine Work-

ers, both supra; Board of Trade of City of Chicago v. Olsen, 262 U. S. 1, 32, 43 S. Ct. 470, 67 L. Ed. 839; Bedford Co. v. Stone Cutters' Ass'n, 274 U. S. 37, 48, 47 S. Ct. 522, 71 L. Ed. 916, 54 A. L. R. 791.

And within these authorities are decisions upon which much stress is laid by the government, that where a business involves interstate commerce, the regulations may cover transactions wholly intrastate, and include fixing of prices, where that is necessary to effect the remedy sought and where such intrastate transactions constitute an evil and have a direct bearing upon the interstate business conducted by such parties. Swift & Co. v. United States; Lemke v. Farmers' Grain Co.; Board of Trade of City of Chicago v. Olsen, all supra; Dahnke-Walker Co. v. Bondurant, 257 U. S. 282, 42 S. Ct. 106, 66 L. Ed. 239.

So where the interstate and intrastate transactions of carriers are so interrelated that the regulation of the one involves the control of the other, Congress has the power to prescribe or regulate the rates as to the intrastate trade where required for the protection of the interstate commerce. Minnesota Rate Cases, supra; Houston, E. & W. T. Ry. v. United States, 234 U. S. 342, 351, 34 S. Ct. 833, 58 L. Ed. 1341; Railroad Commission of Wisconsin v. C., B. & Q. R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; United States v. Louisiana, 290 U. S. 70, 54 S. Ct. 28, 78 L. Ed. 181.

And where an association, instrumentality, or agency seeks by a conspiracy or a monopoly to restrain the free flow of interstate commerce, such evils are within the power of Congress to prevent. Swift & Co. v. United States; United Mine Workers v. Coronado Coal Co.; Coronado Coal Co. v. United Mine Workers; Bedford Co. v. Stone Cutters' Ass'n, all supra; Standard Oil Co. v. United States, 221 U. S. 1, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; United States v. Patten, 226 U. S. 525, 543, 33 S. Ct. 141, 57 L. Ed. 333, 44 L. R. A. (N. S.) 325.

The exercise of these powers by the Congress under the commerce clause of the Constitution of the United States extends to the control of that which directly and substantially affects interstate commerce, but does not so extend where such effect is secondary, accidental, or remote.

Applying these rules to the facts at bar, there can be but one answer. From the very nature of defendants' business any effect upon interstate commerce must necessarily be secondary. The price they pay or receive for

their milk may be affected or controlled by the price in industrial centers to which excess milk supplies are shipped in interstate commerce, but it does not follow that the business conducted by the defendants so affects the price of milk in industrial centers as to be a burden on interstate commerce.

I agree with the attorneys for the government that nisi prius courts should interfere with an act of Congress, or executive branch of the government duly exercising its authority under any such grant, with care and caution, and only where it appears beyond a reasonable doubt that the Congress or such agency has exceeded its authority. But in this case, it is so clear that the business of the defendants is not within the current of interstate commerce that I could not conscientiously hold otherwise.

Other courts have in well-considered opinions reached a like conclusion under similar state of facts. Under the Agricultural Adjustment Act (7 USCA § 601 et seq.): Edgewater Dairy Co. v. Wallace (D. C.) 7 F. Supp. 121; Royal Farms Dairy v. Wallace (D. C.) 7 F.Supp. 560; United States v. Greenwood Dairy Farms, Inc. (D. C. S. D. Ind.) 8 F. Supp. 398, decided Sept. 27, 1934. Under the National Industrial Recovery Act 48 Stat. (195): Purvis v. Bazemore (D. C.) 5 F.Supp. 230; Hart Coal Corp. v. Sparks (D. C.) 7 F.Supp. 16; United States v. Mills (D. C.) 7 F.Supp. 547; United States v. Gearhart (D. C.) 7 F.Supp. 712; Irma Hat Co. v. Local Retail Code Authority (D. C.) 7 F.Supp. 687.

It follows that the application for a temporary injunction should be, and the same is, hereby denied. Plaintiffs except.