SOUTH PORTO RICO SUGAR CORPORATION, Petitioner, *v.* SUGAR BOARD OF PUERTO RICO, Respondent.

No. 37.        Decided April 8, 1963.

*James R. Beverley, F. Castro Amy,* and *A. Castro Fernández* for petitioner. *Lydia F. Marcos* for The Sugar Board of Puerto Rico. *Alejandro Romanace, Osvaldo de La Luz Vélez,* and *Carlos Chavier Stevenson* for amicus curiae, Land Authority of Puerto Rico.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE RIGAU delivered the opinion of the Court.

The Sugar Act of Puerto Rico, Act No. 426 of May 13, 1951, as amended, 5 L.P.R.A. §§ 371–405, provides, *inter alia,* that liquidations of sugar pertaining to the "colonos" (sugarcane growers) shall be made by the "centrals" (sugar mills) taking as the value of the sugar the average price of the sugar of Puerto Rico, paid C.I.F. New York corresponding to the fortnight or month in which the cane has been delivered by the colonos to the central, and it further provides that the central may deduct from that price the "actual" shipment and marketing expenses "incurred," which expenses must be previously approved by the Sugar Board. Sections 7 and 8 of the Act, 5 L.P.R.A. §§ 376 and 377.

The Act also provides, in the above cited § 8, that if the Board or any colono should not agree to the fairness or correctness of said shipment and marketing expenses, the Board, either at the request of the colono, or *motu proprio*, shall hold a hearing to settle the matter and the central may not make the final liquidation until the Board decides the controversy.

Since the Sugar Board is in charge of a detailed regulation and supervision of the sugar industry in Puerto Rico, that Board, as is usual in these situations, has been empowered by law to examine witnesses, hear testimonies, make inquiries, inspections, and investigations, hold hearings and to do all that is necessary and proper in the discharge of its duties. Section 23 of the Act, 5 L.P.R.A. § 392.

In compliance with its duties, the Sugar Board sent to the South Porto Rico Sugar Corporation (Guánica Central) a form concerning the shipment and marketing expenses of sugar, requesting it to fill it out and to return it to the Board "as promptly as possible." Four months after this communication from the Board, since the Central had not returned the above-mentioned form, the Board, by an order to that effect, granted the Central seventeen (17) days to submit the form or otherwise to appear at the end of said term at a specific day and hour before the Board to show cause why no action should be taken against the Central pursuant to § 23 of the Act, 5 L.P.R.A. § 392.

After an investigation was instituted by the Board, and after other proceedings which need not be recited here, and after a hearing on the shipping and marketing expenses deducted by the Central from the payments to the colonos during the years 1955–1959, both inclusive, the Board and the Central reached an agreement as to several items in controversy, but there was left pending for discussion the item of the expenses of shipping bulk sugar, in connection

with which they stipulated a number of facts on January 18, 1961.

It is the duty of the Board to see that the items for shipping and marketing expenses reported by the centrals are correct, because, since the sugar is sold C.I.F. New York (and therefore, said expenses are deducted by the centrals from the price of the sugar to be paid to the colonos), if those expenses were inflated the colonos would be improperly prejudiced. It may be clearly seen that if the expenses reported are legitimate and correct, the situation would be legal and fair; but if the centrals were to manipulate the accounting of those expenses so that they might obtain undue benefits in the shipping and marketing operations, then the situation would be unfair and illegal.

In the case at bar, the Board objected to the item to be deducted from the payments to the colonos for sugar shipping expenses in Puerto Rico reported by the Central, for two reasons. One is, as the Board pointed out, that the Central made a profit in that shipping operation by means of a system of affiliated corporations (sister corporations) which were all owned by a parent or holding company and the Board considers that the profit is not an expense *actually incurred* by the Central in the shipment of sugar, and that it should not be deducted from the price paid to the colonos. The other reason is that the bonus payment for expeditous loading (dispatch money) obtained by the sister corporations represents a saving in the expense of shipping the sugar and it is therefore not an expense actually incurred, and hence, it should not be deducted from the price of the sugar to be paid to the colonos. The Board held that by means of this system of affiliated corporations, the Sugar Act is violated and the public policy is thwarted.

The position of Guánica Central is that the deduction of these amounts from the price paid to the colonos is proper because it was not South Porto Rico Sugar Corporation

(Guánica. Central) but other corporations that made the profit and received the dispatch money.

It may be noted that the Board pierced the corporate veil to see what was actually happening behind the certificates of incorporation. The issue, as pointed out by the amicus curiae in its brief, is whether a central or its owners, by means of the organization of several subsidiary corporations, may circumvent a legislative mandate, contained in § 8 of the Sugar Act, that only shipment and marketing expenses *actually* incurred may be deducted from payments to the colonos. A closer examination of the situation is necessary in order to determine whether the Board was justified.

On the basis of the above-mentioned stipulation of January 18, 1961 and the evidence presented, the following facts may be determined:

(1) South Porto Rico Sugar Corporation (Guánica Central) is a domestic corporation engaged in the manufacture of sugar at Ensenada, Puerto Rico.

(2) Mar Ancha Corporation (Mar Ancha) is a corporation organized in Delaware and has been engaged in Puerto Rico since 1957 in the bulk shipment of sugar from the port of Ensenada.

(3) In 1957 Mar Ancha purchased the facilities and the assets and liabilities of Administradora de Ingenios, C. por A. (Administradora), a corporation organized in the Dominican Republic. Prior to that date Administradora operated the shipping business which Mar Ancha now owns and operates.

(4) South Puerto Rico [Sugar] Trading Corporation (Trading) is a corporation organized in New York. It is engaged in the purchase, sale and maritime transportation of the sugar produced by Guánica Central.

(5) The South Puerto Rico Sugar Company of New Jersey is, and has been from the beginning, the owner of all

the shares of all the above-mentioned corporations and it was also the main stockholder of Administradora.[1]

(6) The main officers of these four corporations (Guánica Central, Mar Ancha, Trading, and South P.R. Sugar Co. of N.J.) are the same, to wit: G. Douglass Debevoise, President; James W. Clauson, Treasurer; and David D. Watkins, Secretary, except that the President of Mar Ancha is Edward C. Spaeth. Spaeth is also a member of the Board of Directors of the South P.R. Sugar Co. of N.J., of Trading, of Mar Ancha, and was a member of the Board of Directors of the dissolved Administradora.

(7) Debevoise, the President of Guánica Central, of Trading, and of the New Jersey Corporation, is also director of those three corporations and of Mar Ancha. Clauson, the Treasurer of the above-mentioned corporations is also director of all of them. Spaeth, the President of Mar Ancha, is director of the New Jersey corporation, of Trading, of Mar Ancha, and was the president and director of Administradora.

(8) The parent corporation, South Puerto Rico Sugar Company of New Jersey, receives all the dividends declared by the above-mentioned three subsidiary corporations.

(9) The facilities of bulk shipment of Mar Ancha are joined to the bulk sugar facilities of Guánica Central and they are used chiefly for shipping the sugar produced by Guánica Central. During the years 1956–1958, Mar Ancha and its predecessor, Administradora de Ingenios, rendered services for pay for the shipment of sugar of other centrals.

---

[1] Said parent corporation of New Jersey is also owner of Central Romana Corporation, of Central Romana By-Products Co., Inc., of Magdalena Development Corp., and was owner of the dissolved Yngenio Santa Fe, Inc., all operating in the Dominican Republic, and of Guánica Agricultural Service Co., operating in Puerto Rico. The properties and operations of Yngenio Santa Fe passed to Central Romana Corporation. *Manual of Sugar Companies*, 35th ed. (1960), Kittner ed., Fair, Withlock and Co., N.Y., pp. 115–118.

(10) During the years 1955–1959, the years in controversy herein, Guánica Central sold its entire production of sugar to its subsidiary Trading.

(11) According to the stipulation: "The rates charged by Administradora de Ingenios and Mar Ancha Corporation in the years 1955–59 to Guánica Central for the shipment of sugar produced by the latter include profits for each one of said corporations, respectively." According to the brief of petitioner Guánica Central, "The Trading Corporation contracted the services of Administradora first, and later those of Mar Ancha to do the bulk shipment of the sugar purchased from Guánica Central for a price which included a profit for said subsidiary shipping companies, and subsequently it charged Guánica Central those expenses as provided in the contract of sale." As may be seen there is an apparent contradiction between the two statements because in the first it is said that Administradora and Mar Ancha charged Guánica Central for the sugar shipment and the second statement says that it was Trading which charged Guánica Central for that service. The position of the Sugar Board is precisely that there is actually no contradiction because, the Board maintains, Trading was a mere agent of Guánica Central, and because the Board challenges this series of sister corporations which appear as participating in the sugar shipping operation.

(12) Trading chartered the ships for the transportation of sugar and consequently received the dispatch money from the shipping companies.

(13) Prior to 1955 when the sugar was shipped in bags and not in bulk, the sugar produced by Guánica Central was shipped by third parties such as Bull Insular Line and Lykes.

Having seen what the corporate organization is on paper, it is convenient that we examine how the shipment of bulk

sugar actually operates. We quote now from the brief of the amicus curiae:

"In the factory of South Puerto Rico Sugar Co., Inc. (P.R.) the cane reaches the mill where it is converted into sugar. From the mill the sugar passes by means of conveyors to the warehouse, where it is deposited. In the warehouse there is an air pressure chute which draws in the bulk sugar and conducts it through a pipe to the roof of the warehouse where it drops the sugar into the conveyor. At the moment that the sugar falls from the suction pipe into the conveyor that takes it across the rail of the carrier, the corporate veil covering Mar Ancha Corporation falls. When the sugar crosses the rail to be deposited in the hold of the ship, the curtain covering the South Puerto Rico Sugar Co. Trading Corporation falls. We have that in an operation which possibly does not cover a stretch of more than one hundred feet, there are three corporations involved and the operation expenses of two of them with their benefits are charged to the colono in the share corresponding to him. The shipping operation in itself, which is continuous, reveals the nature of the mystery of the corporate veils. In reality and due to the nature of the facts the veils of the subsidiaries cover up a single integrated enterprise."

The Board states that it considered the following additional factors before deciding as it did:

(1) "The lease contract between South P.R. Sugar Co. (Guánica Central) and its sister corporations, wherein the use of a private dock was granted to be operated under its instructions and under the charges also fixed by Guánica Central. (Exhibit 4 T.E. pp. 100–105.) That contract offered the services at cost between the parties and after the term of 10 years the installations and machinery would become the property of Guánica Central without any payment whatsoever. The Board concluded that the contract had not been executed with an independent commercial spirit. (Tr. Rec. 38.) At the time of this contract, April 18, 1955 (T.E. p. 70), the statute in force was 14 L.P.R.A. § 56, which insofar as pertinent reads: 'The existence of intercompany transactions, on a basis other than those of an inde-

pendent commercial spirit, shall be considered, prima facie, as evidence of control or dominion . . .'."

(2) "Joint provisional rates fixed by the Public Service Commission and accepted by South P.R. Sugar Co. and Mar Ancha Corporation to render services of storage and shipment of bulk sugar (Exhibit 5) (T.E. p. 106)."

(3) "The admission of Mar Ancha Corporation (Tr. Rec. 36) in its application for franchise to the Public Service Commission that they were of the firm opinion that they were not public service companies. They considered the sugar which Mar Ancha shipped as if it were its own sugar because if it was engaged in shipping someone else's sugar they would have had no doubt that it was acting as a public utility. Administradora de Ingenios C. por A. only shipped sugar of Guánica Central (T.E. pp. 113–114)."

(4) "In 1954 when Guánica Central shipped bag sugar no intermediate subsidiary corporation existed between South P.R. Sugar Company (Guánica Central) and South P.R. Sugar Trading Corporation. The dispatch money was insignificant in comparison with the money received for the shipment of bulk sugar, since the latter is performed within a much shorter period than the time needed for the shipment of bag sugar. (Tr. Rec. 40–41.) (T.E., Llabrés, p. 23.)"

(5) "The history of the business relations, within the sugar industry, between South P.R. Sugar Corp. of New Jersey and its subsidiary corporations in Puerto Rico (Tr. Rec. 50–51)."

(6) "Besides considering those elements, the Sugar Board disregarded the corporate separation between the entities in question, considering that a common product is involved, the sugar of the colonos, as part of a structure and as economic tools of the same stockholders, thereby thwarting the public policy defined by the Sugar Act."

In the light of all these circumstances and after a number of legal considerations the Board, in its extensive opinion, decided as follows:

1. "To consider for the purpose of the Sugar Act that South Puerto Rico Sugar Co. of New Jersey, South Puerto Rico

Sugar Co.. (Guánica Central), Administradora de Ingenios C. por A., Mar Ancha Corporation (Successor of Administradora de Ingenios C. por A.), and South Puerto Rico Sugar Trading Corporation operates as a single entity and therefore Administradora de Ingenios C. por A. and Mar Ancha Corporation dealt and deal with their own sugar when they shipped and ship the sugar produced by South Puerto Rico Sugar Co. (Guánica Central), notwithstanding the fact that the sugar had been sold to its subsidiary South Puerto Rico Sugar Trading Corporation which contracted for the shipment of sugar produced by South Puerto Rico Sugar Company (Guánica Central)."

2. "The Sugar Board has jurisdiction to examine the contract and it may determine the reasonableness of all the contracts executed by South Puerto Rico Sugar Trading Corporation in connection with the handling of the sugar of South Puerto Rico Sugar Co. (Guánica Central)."

"To decide differently would be to permit violations of § 8 particularly, and of the spirit of the Sugar Act and the legislative intention in general, by reducing the net share in the product of the cane of the colonos due them, as fixed by law."

On the basis of what it had determined, the Board issued the following Order:

"THEREFORE, in order to determine the effect of the distribution of operations of shipment and marketing of sugar produced by South Puerto Rico Sugar Company (Guánica Central) among the subsidiary corporations, the Sugar Board, before proceeding with the hearing of these cases, orders South Puerto Rico Sugar Co. of New Jersey and/or South Puerto Rico Sugar Co. (Guánica Central):

"1. To permit the Accountant of the Board, Mr. Ramón Llabrés, at his request; to examine the books of Administradora de Ingenios C. por A., and of Mar Ancha Corporation in order that he may investigate the expenses actually incurred in the shipping of sugar produced by South Puerto Rico Sugar Co. (Guánica Central) during the years under investigation (1955 to 1959, both inclusive), or in default thereof to file with the Secretary of the Sugar Board all the books and documents of the aforesaid corporations which may reveal those expenses.

"2. To file with the Secretary of the Sugar Board on or before May 31, 1961 all the contracts executed between South Puerto Rico Sugar Co. and South Puerto Rico Sugar Trading Corporation in the handling of the sugar produced by South Puerto Rico Sugar Co. (Guánica Central) in order that the Sugar Board may determine how those contracts affect the reasonableness of the shipping and marketing expenses that South Puerto Rico Sugar Co. (Guánica Central) should deduct from the payments to the colonos during the years 1955–1959, both inclusive."

Petitioner alleges that the Sugar Board erred:

1. "In disregarding the separate corporate identities of South Puerto Rico Sugar Co. of New Jersey, Administradora de Ingenios C. por A., Mar Ancha Corporation, South Puerto Rico Sugar Corp. (Guánica Central) and South Puerto Rico Sugar Co. Trading Corp., and in deciding that those corporations constitute a single entity and operate as such for the purposes of the existing Sugar Act."

2. "In deciding that under the Sugar Act there exists a public policy against transactions between a sugar central and other entities affiliated thereto."

3. "In deciding that under the Sugar Act no deduction may be made to the colonos of Guánica Central for shipment and marketing expenses of that part of the shipping expenses of sugar paid by said central, which represents a profit for Administradora de Ingenios and Mar Ancha Corporation for the services which they rendered in shipping the sugar during the crops of 1955 to 1959."

4. "In deciding that the dispatch money paid to South P.R. Sugar Trading Corporation by the steamship companies under the charter contract between them for the shipping of sugar purchased by said Trading Corporation from Guánica Central during the years 1955–1959, must be credited to the shipping and marketing expenses of Guánica Central during those years."

5. "In assuming jurisdiction and venue to consider the legality of the operations of Administradora de Ingenios and Mar Ancha Corporation under the Public Service Act of Puerto Rico."

■ The reversal sought is not warranted. We shall set forth as briefly as possible our premises and our conclusion. As is well known, the sugar industry in Puerto Rico is an industry vested with public interest and it may be regulated by the Legislative Assembly. *Mayagüez Sugar Co.* v. *Sugar Board*, 79 P.R.R. 401, 402 (1956); *Central San Vicente* v. *Sugar Board*, 78 P.R.R. 760, 764 (1955); *A. Roig, Sucrs.* v. *Sugar Board*, 77 P.R.R. 324, 327, 330, 332 (1954), *affirmed* in 235 F.2d 347; *Eastern Sugar Associates* v. *Sugar Board; Aponte, Int.*, 77 P.R.R. 339, 353 (1954), *affirmed* in 235 F.2d 347, *Vidal* v. *Fernández*, 104 F.2d 606, *cert. denied*, 308 U.S. 602.

An examination of the Sugar Act, Act No. 426 of May 13, 1951, 5 L.P.R.A. § 371 *et seq.* and of its predecessors, Acts No. 112 of 1937 and No. 221 of 1942, shows the close relationship that has existed and still exists between this industry and the Puerto Rican community.[2] An official estimate made in 1957 reveals that the production of sugar in Puerto Rico represents a potential income of approximately 150 to 170 million dollars annually. Declaration of Policy of Act No. 29 of June 6, 1957 (Sess. Laws, p. 56). By means of this Act No. 29 of 1957, 5 L.P.R.A. §§ 415–419, the Legislative Assembly established a system of incentive payments for the cost of new planting of cane; it declared that the public policy of the Commonwealth is to encourage

---

[2] For antecedents, which to a great extent produced this legislation, see Clark and Associates, Porto Rico and its Problems, a publication of Brookings Institution, 1930; Picó and Haas, "Puerto Rico" in *The American Empire*, Haas ed., 1940; Tugwell, *Investigation into Administrative Responsibilities Under the 500 Acre Limitation on Land Holdings*, a report to the Secretary of Interior of the United States, 1941; Novas, *La Central Azucarera como Empresa de Servicio Público*, 8 *Rev. C. Abo. P.R.* 342 (1945); Tugwell, *The Stricken Land* (1947); Perloff, *Puerto Rico's Economic Future* (1950); Eastman & Marx, *Ships and Sugar* (1953); Acosta-Velarde, *Consideraciones Sobre la Ley Azucarera de Puerto Rico*, in *Revista del Café* (P.R.), Sept. 1953, p. 13; Hanson, *Transformation* (1955).

the production of that industry, and appropriated a million dollars from the insular treasury for said purposes.[3] In his Message to the Legislative Assembly on February 14, 1963, the Governor of Puerto Rico stated the following:

"Six years ago we launched a program of direct incentives for the growers in Puerto Rico to renew the planting of their crops. This program has cost $8.4 millions in the last six years. In addition we have enhanced research and given instructions to intensify educational efforts in the cane producer."

The Legislative Assembly of Puerto Rico has for many decades maintained a public policy in relation to the sugar industry.[4] The Sugar Act in force, Act No. 426 of 1951, 5 L.P.R.A. § 371 *et seq.*, regulates the relationship and contracts between the colonos (the cane producers) and the centrals; establishes the compensation to be received by the colonos for hauling and delivery expenses; establishes the procedure to be followed by the centrals in order to determine the yield of sugar of the colonos' canes; determines the minimum share of the colonos in the sugar and in the molasses produced; regulates, as we have seen, the deductions for shipment and marketing that may be made by the centrals and it imposes certain obligations and establishes certain rights between the colonos and the centrals. One of the purposes of that legislation, the present as well as the former, was and is to protect the colonos—who are economically weaker and who have less industrial know-how—against the centrals, and to guarantee them, at least before the law, a fair treatment in their relations with the sugar mills. *South Porto Rico Sugar Co.* v. *Sugar Board,* 82 P.R.R. 456, 464 (1961); *A. Roig, Sucrs.* v. *Sugar Board,* 77 P.R.R. 324, 333

---

[3] For comparison purposes, note that in that economic year, 1956–57, the appropriation of the Legislative Assembly was $3,087,708 for the entire judicial branch of Puerto Rico.

[4] Acts No. 112 of May 13, 1937; No. 221 of May 12, 1942; No. 426 of May 13, 1951; No. 29 of June 6, 1957.

(1954); *Godreau & Co.* v. *Public Service Commission*, 71 P.R.R. 608, 617 (1950).

■ With these considerations in mind concerning the public interest vested in the sugar industry in Puerto Rico and the nature of our legislation on the matter, we must turn to see whether, operating within that reality, the Sugar Board is justified in piercing the corporate veil. The texts and the cases keep quoting the widely known pronouncement of Judge Sanborn rendered in the case of *United States* v. *Milwaukee Refrigerator Transit Co.*, 142 Fed. 247, 255 (1905), where he said: "If any general rule can be laid down . . . it is that a corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons."

■ That the corporate veil will be pierced when the corporate personality is used "to defeat the public convenience, justify wrong, protect fraud or defend crime" is too well settled to require detailed discussion, is the opinion of Professor Stevens (Stevens, Corporations 95, 2d ed., 1949). The study we have made of the cases and textwriters confirms this statement. V. I. Oleck, Modern Corporation Law 25, 28–72 (1958); Ballantine, Corporations 292–93, 305–306, 329–332 (1946 Rev. ed.); Lattin, Corporations 66–68 (1959); Berle & Warren, Business Organization (Corporations) 155–156 (1948); I Fletcher, Cyclopedia of Corporations 134–177 (1931); Comment, 6 De Paul L. Rev. 244 (1957); Berle, *The Theory of Enterprise Entity*, 47 Colum. L. Rev. 343 (1947); Note, *Efficacy of the Corporate Entity in Evasion of Statutes*, 26 Iowa L. Rev. 350 (1941). The case law in this sense is abundant and it would be superfluous to cite it all here. It suffices to mention some illustrative ex-

amples and for more cases we refer to the extensive annotations which appear in the cited textbooks.

In *N.L.R.B.* v. *Deena Artware Inc. et al.*, 361 U.S. 398 (1960), a case similar to the one at bar in the sense that an administrative board decided to investigate a corporate organization in order to determine the actual facts, the Supreme Court of the United States said at p. 402: "But we think the Board is entitled to show that these separate corporations are not what they appear to be, that in truth they are but divisions or departments of a 'single enterprise';" and at p. 403 it referred to the main problem of "whether in fact the economic enterprise is one, the corporate forms being largely paper arrangements that do not reflect the business realities." The power of the Board to investigate was upheld.

■ The corporate entities may be disregarded when they are instruments to evade a clear legislative purpose. *Schenley Distillers Corporation* v. *United States*, 326 U.S. 432, 437 (1946). In *Anderson* v. *Abbott*, 321 U.S. 349, 362–63 (1944), the court spoke in decisive terms:

". . . It has often been held that the interposition of a corporation will not be allowed to defeat a legislative policy, whether that was the aim or only the result of the arrangement. *United States* v. *Lehigh Valley R. Co.*, 220 U.S. 257; *Chicago, M. & St. P. Ry. Co.* v. *Minneapolis Civic & Commerce Assn.*, 247 U.S. 490; *United States* v. *Reading Co.*, 253 U.S. 26. The Court stated in *Chicago, M. & St. P. Ry. Co.* v. *Minneapolis Civic & Commerce Assn.*, supra, p. 501, that 'the courts will not permit themselves to be blinded or deceived by mere forms or law' but will deal 'with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require.' "

The courts pierce the corporate veil when the intention or the purpose of the corporate structure is to evade compliance with a statute. *Northern Securities Co.* v. *United States*, 193 U.S. 197 (1904); *Linn & Lane Lumber Company* v. *United States*, 236 U.S. 574 (1915); *Barbour* v. *Thomas*,

7 F.Supp. 21 (1933); *Metropolitan Holding Co.* v. *Snyder*, 79 F.2d 263 (1935).

For other judicial expressions on this point see *United States* v. *Reading, supra,* at 63; *Taylor* v. *Standard Gas Co.,* 306 U.S. 307, 322 (1939); *United States* v. *Lehigh Valley R.R. Co., supra,* at 259; *Day* v. *Shapiro,* 267 F.2d 669, 673 (1959); *Superior Portland Cement* v. *Pacific Coast Cement,* 205 P.2d 597, 620 (1949); *California Zinc Co.* v. *United States,* 72 F.Supp. 591, 593 (1947). In our jurisdiction the principle has also been previously recognized, *J. E. Candal & Co.* v. *Rivera,* 86 P.R.R. 481 (1962); *Heirs of Pérez* v. *Gual,* 76 P.R.R. 898, 902 (1954); *Cruz* v. *Ramírez,* 75 P.R.R. 889, 897 (1954).[5]

---

[5] In modern industrial democracies corporations as well as labor unions have emerged as organizations of extraordinary power. In some countries, in some occasions, their power has been such that it has given rise to what the observers of this social phenomenon have called "government by private groups" (51 Harv. L. Rev. 201; 13 La. L. Rev. 440). In Puerto Rico an alert social conscience has so far saved us from this evil. In every democracy such a danger always exists latently and to prevent its materialization it is necessary that the problem be understood by the citizenry and by its leaders. The democratic state, and not the private, professional or commercial groups, is ultimately the depositary of the general interest and it is bound to that interest alone.

In the United States the role of the great corporations, not always good nor always bad, has been the object of attention of eminent lawyers, economists, and sociologists. Since the Second World War, for example, interesting analyses of the problem have been published, Drucker, The Concept of the Corporation (1946); Lilienthal, Big Business (1952); Galbraith, American Capitalism (1952); Berle, The 20th Century Capitalistic Revolution (1954); Latham, 47 Am. Econ. Rev. 303 *et seq.* (1957). Although those authors, as is natural, make different evaluations, they all agree in that the great industrial and labor organizations have ceased to be a matter of mere private interest. They cease to be so to the extent that they acquire power over the social body in general. In the future, parliaments, courts and jurists will face the problem of creating the juridical equations capable of maintaining the social balance between those powers which must be preserved if the democratic way of life is to survive. It is well to be conscious of this task. See Friedmann, *Corporate Power, Government by Private Groups, and the Law,* 57 Colum. L. Rev. 155 (1957) and Friedmann, Law in a Changing Society 288–320, London, Stevens & Sons Ltd. (1959).

■ In view of the above-described corporate organization, of the nature of the bulk sugar shipping operation and of the applicable law, we conclude that the Sugar Board was justified in piercing the corporate veil in order to do its duty in the administration of the Sugar Act. To permit the sugar shipping operations to be fragmented artificially by the interpolation of several sister corporations and to permit the latter to derive profit in said operations is tantamount to evading the clear mandate of § 8 of the Sugar Act, 5 L.P.R.A. § 377, and thwarting the public policy contained in said section of guaranteeing to the colonos a fair treatment in their relations with the mills. *Central Monserrate, Inc.* v. *Sugar Board*, 83 P.R.R. 105, 110 (1961); *Roig* v. *Sugar Board*, 235 F.2d 347, 351–352 (1956), *cert. denied*, 352 U.S. 928 (1956). The profits made by the sister corporations in the shipping operation would eventually find their way to the parent corporation in New Jersey, which is owned by the same persons who own Guánica Central and at the same time the price to be received by the cane producers for their sugar would be reduced. As we said in *South P.R. Sugar Co.* v. *Sugar Board*, 82 P.R.R. 456, 464 (1961): "It is obvious that neither the Sugar Board nor this Court will allow the use of any legal fiction, no matter how clever or ingenious it may appear at first sight, to destroy the rights granted by law to the colonos, nor the equitable spirit that should prevail in the relationship between the parties."

■ For the reasons above stated we are of the opinion that errors 1 to 4 were not committed. Nor was the fifth error committed. The Board assumed jurisdiction of a matter with respect to which it clearly has authority: to investigate the veracity and reasonableness of the deductions made by petitioner from payments to the colonos for shipment and marketing expenses, 5 L.P.R.A. §§ 377 and 392; *Central Monserrate, Inc.* v. *Sugar Board, supra*, at 110.

The decisions and orders of the Sugar Board rendered in this case on May 8, 1961 and June 12, 1961, will be affirmed.